# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **TRAVIS FORREST,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00039** |
| | ) | **Judge Aleta A. Trauger** |
| **CSX TRANSPORTATION, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This case concerns plaintiff Travis Forrest's allegations of discrimination and retaliation against his former employer, the defendant CSX Transportation, Inc. ("CSX"). For the reasons set forth herein, the court will grant in part and deny in part the defendant's Motion to for Summary Judgment (Doc. No. 58) and will deny as moot the defendant's Motion to Strike (Doc. No. 64).

## I.     FACTS

### A.     Background

Unless otherwise indicated, the facts set forth herein are undisputed[1] and viewed in the light most favorable to the plaintiff, as the non-moving party. *See Milczak v. Gen. Motors, LLC*,

---

[1] In addition to facts that the parties have designated as "undisputed," the court will also consider facts undisputed when a fact is undisputed for the purpose of the summary judgment motion or when the court has determined there is no genuine dispute. Further, the plaintiff responds to many of the defendant's proposed facts by "disput[ing] the proposed fact insofar as it implies" a further fact. (*See* Doc. No. 62 ¶¶ 5, 6, 10, 13, 17, 18, 21, 24, 25, 28, 30, 32–35, 37–47, 50, 52, 54–57, 59–60.) In some instances, the plaintiff disputes the implications of asserted facts that are merely quotations from the record. (*See, e.g.*, Doc. No. 62 ¶ 37 (disputing the proposed fact—the text of CSX Rule 104.7, which states the conditions under which an employee needs supervisor permission—"insofar as it implies he did not have permission to leave").) The plaintiff's responses in this manner flout Local Rule 56.01(c), which requires that the response to each fact asserted by the summary judgment movant to be undisputed must be in one of three forms, none of which

1

102 F.4th 772, 779 n.1 (6th Cir. 2024) (citing *Palma v. Johns*, 27 F.4th 419, 423 (6th Cir. 2022)) *reh'g denied*, No. 23-1462, 2024 WL 3205990 (6th Cir. June 17, 2024). Factual statements for which no citations are provided are drawn from the plaintiff's Response to CSX's Statement of Facts (Doc. No. 62) or the defendant's Responses to Plaintiff's Statement of Additional Material Facts (Doc. No. 67).

CSX is a Class I Railroad that operates in the eastern half of the United States and Canada, including Nashville, Tennessee. From 2000 until June 20, 2020, Forrest, who is Black, worked for CSX in its Radnor Yard in Nashville—since 2012 as a utility worker. He was removed from work on June 20, 2020 and terminated on August 27, 2020. Forrest worked in the yard's Service Center on a three-person crew comprised of himself and two machinists. The crew's job was to prepare incoming locomotives so that train crews could build trains to exit the yard. Forrest's duties as a utility worker included moving locomotives around the yard, switching rail cars, fueling locomotives, "sanding" locomotives,[2] and cleaning the locomotives and locomotive shops. During Forrest's shifts, he was the only utility worker.

Milton Storm was, during the relevant time period, Senior Mechanical Manager at CSX's Radnor Yard Facility. In that role, Storm managed Joseph Brown, who was Forrest's direct

---

includes disputing a fact's implication. The court will deem the asserted facts to which the plaintiff disputes only their implications as undisputed for purposes of summary judgment. *Accord Underwood v. ADP, Inc.*, No. 1:08-cv-3843-CAP-CCH, 2010 WL 11597506, at *2 (N.D. Ga. Dec. 6, 2010) (finding that a respondent cannot "read implied facts into the movant's statement of material facts merely for the purpose of disputing them" and deeming admitted the defendant's facts to which the plaintiff responded by denying their implications), *R. & R. adopted*, No. 1:08-cv-3843-CAP-CCH, 2011 WL 13269631 (N.D. Ga. Jan. 6, 2011); *Fresquez v. BNSF Ry. Co.*, No. 17-cv-00844-WYD-SKC, 2018 WL 6249686, at *2 (D. Colo. Oct. 2, 2018) (deeming facts the plaintiff "disputed" only by disputing an implication that could follow from them as admitted). In at least one instance, however, the plaintiff claims to dispute an implication of a proposed fact but actually appears to dispute the fact as stated. The court will discuss such instances as they arise.

[2] Sanding involves filling boxes on locomotives with sand to assist with breaking.

supervisor on the day he was terminated. In June 2020, before he was terminated, Forrest complained to Storm that Storm had unfairly disciplined a Black employee for operating a locomotive through a switch, which is prohibited, while failing to discipline a White employee for a similar violation. (Doc. No. 59-9 at 14.) This complaint constitutes the plaintiff's undisputed protected activity for the purposes of his retaliation claim. More broadly, Forrest alleges that Storm habitually discriminated against Black employees. (*See* Doc. No. 46 ¶ 1 ("[Storm] disparately applied CSX's workplace rules against black employees."); Doc. No. 61 at 1 ("[Storm] disciplined Black employees for even minor infractions and offered leniency to white employees.").)

B.   Forrest leaves work early on June 20, 2020

On the morning of June 20, 2020, a machinist on Forrest's crew—Tim Jordan—went home early because of a migraine headache.[3] Shortly thereafter, Forrest spoke with Brown and then also left work early. The content of that conversation and whether Forrest had Brown's permission to leave are contested.

Indeed, much of the briefing concerns CSX's policy regarding employees' permission to leave work early. CSX Workplace Rule 104.7 states that "[e]mployees must have the permission of a supervisor to . . . [l]eave work before designated off-duty time." (Doc. No. 62 ¶ 37.) A violation of Rule 104.7 is a "Major Offense" that warrants removal from service. (*Id.* ¶ 13.) That is uncontested. But what is contested is whether one must *request* permission to leave—as CSX maintains—or whether notice is sufficient, in practice—as Forrest maintains. The defendant characterizes the plaintiff's failure to *request* permission before leaving as a violation of Rule 104.7. The plaintiff describes a workplace where, in practice, employees do not ask for permission,

---

[3] The parties dispute whether Jordan *requested* permission to leave early, but it is undisputed that he indeed left early, leaving Forrest's crew down a person. (Doc. No. 62 ¶¶ 23–24.)

3

but rather, by virtue of giving notice, they obtain permission. The court notes that the defendant repeatedly construes the plaintiff's admission that he did not *request* permission before leaving work early as an admission that he left without permission. (*See, e.g.*, Doc. No. 62 ¶ 36.) This is an inaccurate interpretation of the plaintiff's position.

According to the defendant, Forrest approached his supervisor, Brown, who was on a phone call, and "stated he would not work the engines by himself and that requiring him to do so was 'bullsh#t.'" (*Id.* ¶ 26 (citing Doc. No. 59-1 at 21–23, 25, Forrest Dep. 32:24–34:2, 37:24–38; Doc. No. 59-4 at 5, Brown Dep. 14:6–19) (alteration in original).) As Brown tells it in his deposition, Forrest approached him while he was on the phone and told him "he wasn't working all these engines by himself; it was bullshit." (Doc. No. 59-4 at 5, Brown Dep. 14:18–19.) Brown made a gesture for Forrest to wait—until Brown had finished his phone call—to discuss Forrest's issue. (*Id.* at 14:19–22.) But Forrest left, and, when Brown finished his phone call, Forrest was gone. (*Id.* at 14:23–15:1.)

Forrest disputes CSX's characterization of the conversation. In Forrest's deposition, he says that he approached Brown's desk and "told him [he was] going home because [he] was tired of working all these engines by himself." (Doc. No. 59-1 at 22–23, Forrest Dep. 33:23–34:2.) Forrest explained that, in the last several years, CSX had reduced the number of utility workers per crew from three to one. (*Id.* at 23–24, Forrest Dep. 34:3–35:2.) That day was "pretty hot," Forrest "couldn't get any help," and he was "pretty exhausted." (*Id.* at 24, Forrest Dep. 35:3–9.) Forrest says that, after he expressed his annoyance at the working conditions, "[i]n response, Brown asked if Forrest was going home," to which "Forrest responded that he was going home, and Brown said 'Okay.'" (Doc. No. 62 ¶ 26.) For his part, Brown denies that he said "okay." (Doc. No. 59-4 at 6–7, Brown Dep. 15:15–16:2.)

4

In support of his version of events, the plaintiff cites deposition testimony from his coworker, Wayne Littleton, who says that he overheard Forrest's June 20, 2020 conversation with Brown. As background, Littleton testified that it was a hot day and that Forrest, who was out of shape, was working by himself. (Doc. No. 61-3 at 3, Littleton Dep. 63:3–13.) As Littleton tells it, Forrest "told Joe [Brown] that he was going home. He was hot and he was tired and he was tired of doing the work by himself every day, and he was going home, and Joe said, you're gone? And he [Forrest] said, yeah." (*Id.*, Littleton Dep. 63:19–23.) The plaintiff also cites his own testimony in the resulting internal CSX investigation:

> Okay. On the morning of June 20th, it was pretty humid, pretty hot by 9:00 AM, and we had already worked a couple engines. I'd already dumped the toilet previously. And about 10:00 o'clock I came to Manager Brown and explained to him that it was hot outside and that I needed help, and that it was BS that I had to work all the engines by myself. . . . So, before I could say I was going home, [Brown] leaned back out of his chair and said, "So, are you going home?" And I said, "Yes, I'm going on in." And he said, "Okay." And I clocked out.

(Doc. No. 61-14 at 4–5, Investigation Tr. 17:37–18:2.)

C.    The aftermath of Forrest's early departure

After Forrest left, it is disputed who made the decision to charge Forrest with leaving work without permission and whether and to what extent that person was influenced by others, and for what reason. (Doc. No. 62 ¶¶ 29–30.)

CSX cites Brown's deposition testimony. Brown said that this was the first time Forrest had "walk[ed] off the job without permission" and, moreover, the first time that he had ever seen anyone leave without permission. (Doc. No. 59-4 at 7, Brown Dep. 16:7–14.) Brown states that he called Storm to tell him that he was down two workers. (*Id.* at 6, Brown Dep. 15:6–8.) Storm "asked me what I thought. I said he needed to be charged for leaving. I mean, he left his – he basically walked off the job. I mean, I've never had that happen." (*Id.*, Brown Dep. 15:10–13.)

5

According to CSX, Brown (Forrest's supervisor) called Storm (Brown's supervisor) to tell him what happened, and Brown told Storm that Forrest "needed to be charged for leaving." (Doc. No. 59-4 at 9, Brown Dep. 18:15–24.) Storm then called his supervisor, Charles Hatcher, who instructed Storm to instruct Brown to charge Forrest for leaving work without permission; Hatcher also instructed Storm to tell Forrest that he was being "withheld from service pending an investigation." (Doc. No. 62 ¶¶ 29–30; *see also* Doc. No. 59-4 at 9–10, Brown Dep. 18:24–19:4 ("[Storm] called his direct supervisor, Mr. Hatcher, explained it to him. And then whatever communication they had, Mr. Storm called me back and said that [Forrest] was being removed from service, to write a statement out as to how it went down.").) Milton Storm tells a similar story in his deposition, which the defendant also cites. (*See* Doc. No. 59-3 at 8–10, Storm Dep. 25:15–27:22.) Storm testified that Hatcher did not seek his input about what to do and that "[a]s soon as I told him what [Forrest had] done, Hatcher said, 'Charge him up there. Tell Joe [Brown] to charge him and remove him from service.'" (*Id.* at 10, Storm Dep. 27:14–19.) Hatcher tells a similar story in his deposition: Storm called Hatcher to relay the events, as Brown had relayed them to Storm, and asked him, "you know, 'Hey, how do we handle this?'" (Doc. No. 59-10 at 3, Hatcher Dep. 12:3–17.) Hatcher told Storm that "[he] needs to be charged for abandoning assignment as a serious offense. . . . But yeah, I told Milton [Storm] that he needed to charge him or remove him from service and all the facts will be developed in the hearing." (*Id.* at 3–4, Hatcher Dep. 12:18–13:1.) Hatcher then clarified: "I told Milton [Storm] to charge Forrest . . . for leaving and abandoning his post or abandoning his assignment." (*Id.* at 4, Hatcher Dep. 13:12–14.)

The plaintiff disputes the defendant's characterization of the phone calls. First, the plaintiff states that, at the time, Brown characterized things differently to Forrest's coworker, Littleton: Brown "told Littleton that Storm had made the decision and implied that he [Brown] was against

Storm's decision." (Doc. No. 62 ¶ 29.) In addition, the plaintiff claims that Storm did not do as Hatcher requested, but rather "Storm called Hatcher and recommended not only that Forrest be charged . . . but also that Forrest be charged with a major rule violation." (Doc. No. 62 ¶ 30.) In support, Forrest cites the deposition of his coworker, Littleton.

But the plaintiff's contention—that Brown told Littleton that Storm had made the decision—is not supported by the record the plaintiff cites. As Littleton recalled, "Joe [Brown] said that Milton [Storm] had talked to Hatcher that was in charge at that time, and that Hatcher had told Milton to charge Travis for leaving, and it was out of his hands. And I [Littleton] said, Joe, you know, that's not right; that shouldn't have happened like that. He [Forrest] didn't really do anything wrong, and he [Brown] said, it's out of my hands. It's out of his hands. Milton [Storm] can't do anything to help him." (Doc. No. 61-3 at 3–4, Littleton Dep. 65:18–66:10.)

D.    CSX's Investigation

After Storm's conversation with Hatcher, Storm called Forrest and told him that he was being removed from service, pending an investigation. Brown charged Forrest for leaving work early without permission. CSX held an internal investigation, during which Forrest, Brown, and others—but not Storm—testified and presented evidence. CSX manager Curtis Shogren presided over the investigation. Shogren had not met Forrest before the investigation, and Shogren testified that he did not know, even during the investigation, that Forrest had alleged racial discrimination. (Doc. No. 59-11 at 10, Shogren Dep. 19:19–23.) Shogren found that Forrest had violated Policy 104.7(a)—leaving work early without permission—and 104.3(d)—carelessness, incompetence, or willful neglect of duties—and recommended his termination. (*See* Doc. No. 59-12 at 12 (listing various workplace policies, including 104.3).) It is undisputed that Shogren would not permit Forrest to ask Brown about how workers usually leave work early, when they need to. (Doc. No.

67 ¶ 79.) After the investigation, Rod Logan, the Head of CSX's Mechanical Department, reviewed the investigation transcript and spoke with Shogren, Hatcher, and CSX's Labor Relations Department. Logan then decided to terminate Forrest. It is undisputed that Logan did not know Forrest and did not know about Forrest's racial discrimination allegations. No record evidence suggests that Logan even knew Forrest's race.

Storm's involvement with Forrest's discipline, after the June 20, 2020 telephone call, is disputed. (Doc. No. 62 ¶ 31.) The defendant states that "Storm had no communications about Plaintiff's discipline after this telephone call until after CSX[] terminated Plaintiff's employment. . . ." (*Id.*) The plaintiff states that Storm's "fingerprints are on just about every aspect of Forrest['s] termination." (*Id.*) In support, Forrest cites emails between Storm and CSX regarding the investigation (Doc. No. 61-15.) In the emails, Storm suggests revisions to documents, and multiple emails reference conversations with Storm about the investigation involving Forrest. (*Id.* at 2, 3.)

CSX terminated Forrest on August 27, 2020. Forrest's union requested that CSX rescind the termination, which CSX refused to do. Forrest appealed the termination to a Public Law Board.[4] Among other findings, the Public Law Board found that Forrest "acknowledged that he did not ask for permission to leave early but stated that it was the practice at the location for an employee just to advise the supervisor of an early departure, not to ask for permission." (Doc. No. 59-1 at 46.) Because "Rule 104.7 is clear and unambiguous and required the Claimant to ask his supervisor for permission to leave early, which [Forrest] admittedly did not do," the Board found that Forrest left work without permission. But, because of his "20 years' service with [CSX] with

---

[4] The Public Law Board was created pursuant to the Collective Bargaining Agreement to hear appeals from terminated employees, among others. (Doc. No. 62 ¶ 49.)

no major violations," the Board found, on January 5, 2022, that Forrest should be given another chance and returned to work without loss of seniority but without backpay. (*Id.*)[5]

### E.    Medical examination and inquiries

After the Public Law Board found that Forrest should be returned to work, CSX notified Forrest that it would require him to undergo a physical exam before he would be allowed to resume his duties. (Doc. No. 66-1 at 2.) CSX states that, according to the applicable collective bargaining agreement, Forrest was required to undergo a "return-to-work examination before he returned to his safety sensitive work." (Doc. No. 62 ¶ 6.) Forrest disputes this fact. In support, CSX cites excerpts of depositions of the plaintiff (Doc. No. 59-5 at 3, Forrest Dep. 8:3–11) and his former co-worker, Greg Doss (Doc. No. 59-6, Doss Dep. 45:7–16).[6]

According to an excerpt of the Doss deposition that the defendant filed, Doss is asked, "And you'd agree with me that . . . when CSX workers return to work after, I think it's an [sic] one-year absence, that it's in the Collective Bargaining Agreement that they take return-to-work physicals?" Doss responds, "I don't know that, but yes, sir, I would agree. I'm sure there's something along that – I'm sure the language speaks. I haven't – I don't know that directly without

---

[5] Forrest disputes the proposed facts that contain quotations and summaries from the Public Law Board's findings, "insofar as [they] are not reducible to admissible evidence." (Doc. No. 62 ¶¶ 50–51.) In his response to a previous proposed fact also citing the findings of the Public Law Board (*id.* ¶ 5), the plaintiff similarly challenges the fact's admissibility because, the plaintiff says, courts have found that Public Law Board findings are unreliable and therefore inadmissible. (*Id.* (citing *Ray v. Union Pac. R.R. Co.*, 971 F. Supp. 2d 869 (S.D. Iowa 2013)).) In *Ray*, the court denied the railroad's motion for summary judgment on its former employee's discrimination and retaliation claims. *Ray*, 971 F. Supp. 2d at 894. While the court in *Ray* is critical of the Public Law Board's findings, it does not state that they are inadmissible. And even if they were, the *Ray* court includes the Public Law Board's findings as part of the case's procedural history. *Ray*, 971 F. Supp. 2d at 894–95. While the plaintiff may challenge the neutrality or competence of the Public Law Board, there is no genuine dispute as to what the Public Law Board found.

[6] Doss was a local union chairman. (Doc. No. 65-4 at 5, 12, Doss Dep. 13:9–10, 41:4–11.)

9

reading it, but I would be surprised it if wasn't." (Doc. No. 59-6, Doss Dep. 45:7–16.) In deposition testimony, Forrest did not "take issue with" the medical exam and regarded it as "routine." (Doc. No. 59-5, Forrest Dep. II 8:6–11.)

But even though the plaintiff and his co-worker described return-to-work examinations as routine in their depositions, that does not require this court to find that it is undisputed whether the collective bargaining agreement requires such examinations—where the plaintiff disputes the fact—absent any other record evidence indicating as much. The mere fact that a practice is routine, and that the plaintiff did not "take issue with" it, does not mean that it is required by the collective bargaining agreement. And the court does not credit Doss's deposition testimony that he was "sure there's something along that . . ." and "I would be surprised it wasn't" as decisive on this point. Neither party cites the collective bargaining agreement's provisions regarding medical examinations and inquiries. Neither party points to deposition testimony from CSX representatives on this point. The court finds that this fact is material and genuinely disputed.

In any case, Forrest received a medical examination, shortly after CSX ordered him to, in late January 2022. But the year after the Public Law Board's decision involved, for Forrest, a year of appointments, emails, phone calls, and frustration, and it ended with Forrest's separation from CSX and loss of seniority.

In January 2022, Forrest had an exam with Dr. Caleb Wallwork,[7] who found that Forrest's medical history included sleep apnea and anxiety,[8] which "need[ed] to be addressed before he can be approved to do safety sensitive work." (Doc. No. 21 ¶ 55 (citing Doc. No. 59-5 at 13).) Dr. Wallwork recommended that Forrest see a sleep specialist and a mental health professional. (*Id.*) CSX told Forrest to follow Dr. Wallwork's recommendations. Forrest procured a sleep apnea machine in Summer 2022, provided proof to CSX, and attended sessions with a mental health professional—Dr. Chris Johnston. After Forrest's sessions with Dr. Johnston ended, in December 2022, Dr. Johnston deferred to Dr. Wallwork to sign off on Forrest's return to work. But Dr. Wallwork would not. According to Forrest's deposition testimony, he spoke by phone with Dr. Wallwork, who told Forrest that "he didn't understand why he needed to sign off on it" because "he never had any sessions with me as far as mental health sessions." (Doc. No. 59-5 at 7, Forrest Dep. II at 13:5–18.) Forrest informed CSX that Dr. Wallwork would not clear him to return to work.

---

[7] It is unstated in the briefs precisely how the plaintiff came to see Dr. Wallwork. In deposition testimony, the plaintiff implies that the defendant referred him to Dr. Wallwork: "Q. How did you wind up with Dr. Wallwork. A. That's the facility I had to go to to get my physical to return to work. Q. Was there a handful of facilities to choose from, or was it -- A. Just the one." (Doc. No. 59-5, Forrest Dep. II at 8:22–9:2.) And the plaintiff did not pay for his appointment with Dr. Wallwork. (*Id.* at 11–12, Forrest Dep. II at 70:22–71:2.)

[8] The defendant's proposed fact states that Dr. Wallwork found that Forrest had a history of "severe anxiety." (Doc. No. 62 ¶ 54.) Forrest "disputes the proposed fact insofar as it implies Forrest had severe anxiety." (*Id.*) As discussed above, the court construes disputed implications as non-answers. Here, however, the court will construe the plaintiff's dispute as one about the severity of anxiety Dr. Wallwork found in the plaintiff's medical history. In deposition testimony, the plaintiff explains that his only history of anxiety is a one-time panic attack caused by sleep apnea, as diagnosed by his "sleep apnea doctor." (Doc. No. 61-19 at 2–3, Forrest Dep. II at 10:1–11:12.)

11

Separately, CSX told Forrest it needed additional information from his cardiologist. Forrest complied. CSX told Forrest it needed still further information from his cardiologist. Forrest complied.

The plaintiff states that he "continued to reach out to CSX to understand what more he could possibly do to go back to work." (Doc. No. 67 ¶ 89 (citing Doc. Nos. 61-33 at 2, 62-34 at 2–3).) The defendant admits this proposed fact for purposes of summary judgment. (*Id.*) Document Number 62-34 is an undated letter—which the plaintiff suggests, but does not state, he sent to CSX[9]—in which Forrest describes the frustrating year. According to that letter, after Dr. Johnston declined to clear Forrest to return to work, CSX told him that he would need to find another mental health care provider to clear him to return to work. At the end of January or beginning of February, 2023, he informed CSX that he had an appointment with another mental health care provider on February 7, and that new provider gave him a "return-to-work release to CSX on February 15, 2023." (Doc. No. 61-34 at 2–3.)

Meanwhile, internal CSX emails show that, effective February 2, 2023, CSX revoked Forrest's seniority and that he was separated from the company because he did not comply with CSX's medical information requests.[10] CSX states that Forrest "never provided CSX[] with documentation from any medical professional certifying that Plaintiff's anxiety was sufficiently controlled for a work return." (Doc. No. 59 at 11–12; *see also* Doc. No. 62 ¶ 61.) Forrest disputes this proposed fact and cites a January 2023 email he sent to a CSX representative stating that his neurologist had provided CSX "proof . . . that my episode that Dr[.] Wallwork thought was anxiety

[9] The letter is addressed to "WHOM IT MAY CONCERN."

[10] CSX alternatively states that it revoked Forrest's seniority because of his failure "to comply with the medical department" and because "he failed to timely respond to requests from [its] Labor Relations Department." (Doc. No. 67 ¶¶ 90, 92.)

12

was actually caused by my sleep apnea which [I] also provided you proof of is now under control. . . . Dr. Menendez has sent proof that I do not have anxiety." (Doc. No. 61-22 at 2.)[11]

## II.    PROCEDURAL HISTORY

On November 12, 2020, Forrest filed his first charge with the EEOC. (Doc. No. 59-1 at 42–43.) The EEOC gave Forrest a right to sue on December 15, 2021. (*Id.* at 49–50.) On January 20, 2022, Forrest filed his Complaint. (Doc. No. 1.) On February 26, 2023, Forrest filed his second charge with the EEOC. (Doc. No. 59-7 at 2–5.) The court granted the parties' joint motion to stay and continue pending the EEOC's investigation. (Doc. No. 43.) The EEOC terminated its second investigation at the plaintiff's request and issued the right to sue Notice on July 20, 2023. (Doc. No. 59-8 at 2–3.) Forrest filed an Amended Complaint (Doc. No. 44), this court lifted the stay (Doc. No. 45), and the plaintiff filed his Corrected Amended Complaint (Doc. No. 46), to which the defendant filed an Answer (Doc. No. 47.)

The defendant filed its Motion for Summary Judgment (Doc. No. 58), accompanying Memorandum (Doc. No. 59), supporting documents (Doc. Nos. 59-1 through 59-14), and a Statement of Facts (Doc. No. 60.) The plaintiff filed a Response to the Motion for Summary Judgment (Doc. No. 61), supporting documents (Doc. Nos. 61-1 through 61-35), and a Response to the defendant's Statement of Facts (Doc. No. 62), which included additional facts, to which the defendant filed a Response (Doc. No. 67) and supporting documents (Doc. Nos. 67-1, 67-2). The defendant filed a Reply to the Response to the Motion for Summary Judgment. (Doc. No. 66.) The

---

[11] The parties make no other reference to Dr. Menendez in any filing related to the Motion for Summary Judgment. It is unclear why the plaintiff does not also mention, while disputing this proposed fact, the February 15, 2023 "work release" from a second mental health provider he mentioned in his letter (Doc. No. 61-34 at 3).

defendant also filed a Motion to Strike Improper Declaration Testimony (Doc. No. 64), accompanying Memorandum (Doc. No. 65), and supporting documents (Doc. Nos. 65-1 through 61-8), to which the plaintiff filed a Response (Doc. No. 68) and the defendant filed a Reply (Doc. No. 69).

## III.   LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, *inter alia*, "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"—that it believes demonstrate the absence of a genuine

dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

On a motion for summary judgment, either party may object that the supporting materials their opponent specified "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 674 F. App'x 531, 536–37 (6th Cir. 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to the 2010 amendment).

## IV.    DISCUSSION

### A.    Title VII and § 1981 claims

The plaintiff brings discrimination and retaliation claims under both Title VII and § 1981. Forrest alleges that CSX discriminated against him on the basis of race by terminating him for an offense he did not commit, and, if he had, it would not have merited termination. Forrest alleges that CSX retaliated against him, by the same termination, because he complained to Storm about Storm's discrimination against employees on the basis of race. And, once a Public Law Board found that he should be returned to work, CSX required him to undergo unjustified medical examinations and respond to unjustified inquiries before terminating him for failing to comply with Byzantine requirements. The defendant responds that Forrest cannot make out a *prima facie* case for retaliation, racial discrimination, or disability discrimination.

*1. Discrimination (Counts I and III)*

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). Employment discrimination is also prohibited by 42 U.S.C. § 1981(a), which states in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." Courts review Title VII and § 1981 race discrimination claims under the same standard. *Edmondson v. Nissan N. Am., Inc.*, No. 3:22-cv-00513, 2024 WL 4635051, at *11 (M.D. Tenn. Oct. 30, 2024) (Crenshaw, J.) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999)).

To prove race discrimination under Title VII, the plaintiff must offer evidence that the defendant took adverse action against him and that race was a motivating factor. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012). These elements may be established by direct or circumstantial evidence. *Johnston v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003). The plaintiff's discrimination claims, in the absence of direct evidence of discrimination, are analyzed under the *McDonnell Douglas* burden-shifting framework. *Accord McDonnell Douglas Corp. v. Green*, 411 U.S. 792, at 803–805 (1973). Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. Once he does, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. And if the defendant meets this burden, "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016).

To make out a *prima facie* discrimination case, the plaintiff must show that: (1) he is a member of a protected class, (2) was qualified for his job, (3) suffered an adverse employment decision, and (4) "was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019). CSX concedes that Forrest has satisfied the first three elements of his *prima facie* case. (Doc. No. 59 at 14 n.15 (conceding for purposes of summary judgment only).) But CSX argues that Forrest has not identified any better-treated similarly situated non-protected employees. (Doc. No. 59 at 15–16.) Forrest makes two points in response.

First, Forrest argues that he need not identify a particular comparator because he was "singled out for discipline" for conduct that is not usually punished and for which his "white coworkers" are not punished. (Doc. No. 61 at 10.) Thus, "CSX's discrimination is plain." (*Id.*)

As noted above, plaintiffs can establish the fourth element of the *prima facie* case by showing that they were treated less favorably than similarly situated employees outside their protected class. To show that another employee is "similarly situated," a plaintiff need not demonstrate an "exact correlation" but instead must demonstrate that he and the other employee are similar in "all of the relevant aspects." *Laws v. HealthSouth N. Ky. Rehab. Hosp. Ltd. P'ship*, 508 F. App'x 404, 411 (6th Cir. 2012) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)) (internal quotation marks and emphasis omitted); *see also Hatchett v. Health Care & Ret. Corp. of Am.*, 186 F. App'x 543, 548 (6th Cir. 2006) ("The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated'; rather, the plaintiff and the employee with whom the plaintiff seeks to compare herself must be similar in all of the *relevant* aspects.") (emphasis in original).

When a termination is disciplinary in nature, as here, a plaintiff must show that proposed comparators engaged in acts of "comparable seriousness." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)). To make this assessment, the court may look to several factors, such as whether the individuals "'have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Ercegovich*, 154 F.3d at 352 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)); *See also Johnston v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) (similar). "[T]his bar is not a low one, even granting that for the most part the bar for establishing a *prima facie* case is not considered especially high." *Benitez v. Tyson Fresh Meats, Inc.*, No. 3:18-cv-00491, 2022 WL 1283087, at *43 (M.D. Tenn. Apr. 28, 2022) (Richardson, J.).

Forrest refers generally to White co-workers who were not disciplined for leaving work by the same method that he did, but this does not satisfy the plaintiff's burden to point to a particular better-treated person outside his protected class similar to him in all material respects.[12]

Second, Forrest argues that if he does need to identify a comparator, he has: a white, union-level coworker who also reports to Storm—Clay Baker. (Doc. No. 61 at 10.) Forrest states that "[i]t is undisputed that . . . Baker[] missed work to attend a white pride rally and faced no

---

[12] *Accord, e.g.*, *Ross v. Fluid Routing Sols., Inc.*, No. 1:12-cv-01269-JDB-EG, 2014 WL 2168168, at *20 (W.D. Tenn. May 23, 2014), *aff'd*, 605 F. App'x 544 (6th Cir. 2015) ("[The plaintiff] does not identify any particular individuals with whose treatment hers may be compared. Without more, the Court does not have the ability to assess whether any of these males occupied positions similar to HR manager, also reported to Parys as supervisor, were held to the same standards as Ross, or engaged in conduct similar to hers.").

18

discipline." (*Id.*) Further, Forrest states, "the record shows that Storm knew Baker lied about being sick and still chose not to discipline him." (*Id.*) In addition, "[t]he record . . . shows that Baker committed a number of serious rule violations and Storm turned a blind eye." (*Id.*)

The record Forrest cites in support is insufficient to support his claim that Baker is a relevant comparator. In his brief on this point, the plaintiff cross-references an earlier section of his brief. (*Id.* (citing *id.* at 3).) In that earlier section, the plaintiff discusses Baker and cites four paragraphs of the Plaintiff's Response to the Defendant's Statement of Fact. (*Id.* at 3 (citing Doc. No. 62 ¶¶ 19, 21, 75–76).) Paragraphs nineteen and twenty-one do not mention Baker. (Doc. No. 62 ¶¶ 19, 21.) Paragraphs seventy-five and seventy-six state the following: "In early 2020, Forrest's coworker, Clay Baker, marked off sick. Baker was not sick, and instead attended a white pride rally." (Doc. No. 62 ¶ 75.) "Storm knew Baker was not sick and instead skipped work to attend a white pride rally and still Baker did not receive any discipline." (Doc. No. 62 ¶ 76.) Both paragraphs seventy-five and seventy-six of Plaintiff's Response to Defendant's Statement of Facts cite the same paragraphs of the same six declarations, which the plaintiff submitted in support, and which the defendant has moved this court to strike. (Doc. No. 64.) Some of the cited declaration paragraphs do not support the plaintiff's allegation that Baker skipped work without permission.[13] And other declaration paragraphs do not mention Baker. They state: "I am aware of a White coworker who Milton Storm knows marked off sick and, instead of reporting to work, attended a white pride rally. The employee received no discipline for it." (Doc. Nos 61-4, through 61-8.)

---

[13] For example, the plaintiff cites Doc. No. 61-9 at 3, Littleton Decl. ¶ 7 to support both statements of proposed fact. But paragraph seven of Littleton's declaration states, in full: "I am aware of a White coworker who Milton Storm knows yelled and cursed at another manager and who was not disciplined for it."

19

The court will not address Rule 56(c)(4)'s requirement that statements be made on "personal knowledge." And the court will not address Baker's declaration—which was made and filed after the plaintiff filed his Response to the Motion for Summary Judgment— stating that he used a vacation day to attend a "Second Amendment Rally" and did not claim to be sick. (Doc. No. 65-8 ¶¶ 2–3.)[14] Putting all that aside, the declarants do not name the White coworker who skipped work to attend a rally, who that employee's manager was, or what policy an employee breaks, if any, by lying about being sick, or, if it is a violation, how serious such a violation is.

Even with the requirement that the court view the evidence in the light most favorable to the non-moving party—here, the plaintiff—and draw all reasonable inferences in its favor, the court cannot conclude that a reasonable jury would be able to find in favor of Forrest on the issue of whether a comparator—here, purportedly, Baker—was treated better than he was. Forrest has not presented admissible evidence with the required specificity on this point; therefore, he cannot show the existence of a genuine issue of material fact as to the fourth element of his *prima facie* case, and CSX is entitled to summary judgment on Forrest's discrimination claims under Title VII and § 1981. The defendant's Motion will be granted as to Counts I and III, and they will be dismissed.

### 2. Retaliation (Counts II and IV)

42 U.S.C. § 1981 and Title VII both prohibit retaliation against employees for engaging in protected conduct; "the elements of a retaliation claim under § 1981 are the same as those under Title VII," *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019), and courts review Title VII and

---

[14] Baker appended his attendance record from the day in question. (Doc. No. 65-8 at 4 & ¶ 4.)

Section 1981 retaliation claims under the same standards. *Accord Edmondson*, 2024 WL 4635051, at *11 (citing *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018)).

A plaintiff can prove a retaliation claim by presenting "either direct or circumstantial evidence of a retaliatory motive." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x. 394, 397–98 (6th Cir. 2015). When a plaintiff relies on indirect evidence, as here, the claim proceeds under the *McDonnell Douglas* burden-shifting framework. *Id.* at 398 (citing *McDonnell Douglas*, 411 U.S. 792 ).

Under this framework, Forrest must submit evidence from which a reasonable jury could conclude that he has established a *prima facie* case of retaliation. To do so, he must point to evidence that: (1) he engaged in activity protected under Title VII; (2) the employer knew he engaged in protected activity; (3) an adverse employment action was subsequently taken against him; and (4) Forrest's protected activity was the but-for cause of the adverse employment action. *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020); *Laster v. City of Kalamazoo*, 746 F.3d 714, 730–31 (6th Cir. 2014). If the plaintiff can establish his *prima facie* case, the burden shifts to CSX to provide a "legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802. And if CSX does so, the burden of production shifts back to Forrest to show that CSX's proffered reason was a mere pretext for discrimination. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003).

CSX concedes that Forrest has satisfied the first and third prongs out of his *prima facie* case: that he engaged in protected activity and was subject to an adverse action. (Doc. No. 61 at 15.) At issue are whether his employer knew about the protected activity and whether it was the but-for cause of the adverse employment action.

     a.  <u>Knowledge</u>

It is not enough to show that *an* employee knew about Forrest's protected activity. Rather, to survive a motion for summary judgment on a retaliation claim, the plaintiff must produce evidence from which a reasonable jury could conclude that the decisionmaker ultimately responsible for taking (or ordering) the adverse employment action knew that the plaintiff engaged in the protected activity. *Mulhall v. Ashcroft*, 287 F.3d 543, 552–54 (6th Cir. 2002) (finding no reasonable jury could find retaliation where the plaintiff "failed to produce evidence sufficient to establish that the officials taking the adverse employment action knew of his protected activity"); *see also E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1069 n.4 (6th Cir. 2015) (discussing whether the "relevant decision makers" knew that the plaintiff engaged in a protected activity when they terminated his employment); *Evans v. Professional Transp., Inc.*, 614 F. App'x 297, 300 (6th Cir. 2015) (holding that plaintiffs cannot satisfy the second element of a *prima facie* case by showing "general corporate knowledge," rather they must show that the decisionmaker knew of their protected activity); *Frazier v. USF Holland, Inc.*, 250 F. App'x. 142, 148 (6th Cir. 2007) ("The decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation.") (citing *Mulhall*, 287 F.3d at 551).

When, as here, the adverse employment action was taken by someone other than the person who received the complaint that constituted the protected activity, the plaintiff must "present sufficient evidence from which a reasonable factfinder could infer that [the decision-maker] knew that Plaintiff previously had" engaged in a protected activity. *Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 482 (6th Cir. 2008) (quoting *Kirkendoll v. McCullough*, No. 3:04-cv-00789, 2006 WL 14561, at *11 (M.D. Tenn. Jan. 3, 2006) (Echols, J.). "[K]nowledge of a plaintiff's protected activity can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action." *Mulhall*, 287 F.3d 543, 553 (6th Cir. 2002).

CSX concedes that Forrest discussed allegations of discrimination with Storm. (Doc. No. 59 at 18.) That is, Storm had knowledge of Forrest's protected activity. But, CSX argues, Storm did not make the decision to terminate Forrest; Forrest does not allege that anyone other than Storm retaliated against him; and "it is undisputed that [Rod Logan—Mechanical Department Head and the employee responsible for terminating Forrest[15]] has no recollection of any allegations of discrimination regarding Plaintiff." (Doc. No. 59 at 17–18 & n. 19.)

Forrest responds that it is irrelevant whether Logan knew about his complaints to Storm. Rather, "[i]t is enough for an employee to show that the supervisors involved in the discipline [here, Storm] knew and that the ultimate decision maker relied on those supervisors." (Doc. No. 61 at 15–16 (citing *Taylor v. Donahoe*, 66 F. Supp. 3d 993, 998 (W.D. Tenn. 2014)).) According to Forrest, he "only needs to show that Logan's decision rested on the actions of lower-level managers with knowledge. And the record shows that Logan's termination decision rested entirely on the disciplinary process that Storm initiated." (*Id.*)

According to the plaintiff, once a manager at CSX charges an employee, it is near-certain that the employee will be disciplined because the hearing process is not a neutral forum. (Doc. No. 61 at 16.) "It is further undisputed that the hearing process is entirely driven by managers who make the charging decisions, testify at the hearings, shape the record, and make discipline recommendations." (*Id.*) In his case, Forrest says, his manager, Brown—who knew about the protected activity—testified at the hearing. (*Id.* at 6.) And Storm and the hearing officer—Curtis Shogren—the plaintiff states, "communicated before the hearing," after which "Shogren disregarded both Forrest and Littleton's testimony in order to recommend termination," and

---

[15] *See* Doc. No. 59 at 7–8.

"Logan rubberstamped the discipline, admittedly skimming the transcript and relying on the recommendation and testimony of his managers." (*Id.* at 17.)

The plaintiff argues that Storm influenced the investigation. As discussed above, while the defendant states that Storm's involvement with the investigation ceased after the June 20, 2020 phone call (Doc. No. 62 ¶ 31), the plaintiff has filed internal CSX emails showing that Storm *did* correspond, and speak on the phone with, various CSX employees about the investigation involving Forrest. But the emails do not show that Storm spoke or corresponded with Logan,[16] and the plaintiff has not presented evidence from which a reasonable jury could infer that Logan—who made the decision to terminate Forrest—knew about the protected activity. Nor, as the court will discuss, has Forrest identified a genuine dispute of material fact, when viewed in the light most favorable to the plaintiff and drawing all reasonable inferences in his favor, from which a juror could conclude that Logan was Storm's dupe.

Forrest refers this court to cases discussing "cat's paw liability." A plaintiff alleging liability under the cat's paw theory seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Marshall v. The Rawlings Co.*, 854 F.3d 368, 377 (6th Cir. 2017) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)). "The cat's paw theory, rather, imputes knowledge and discriminatory intent—the cat's paw is the 'unwitting tool' of those with the retaliatory motive." *Bose v. Bea*, 947 F.3d 983, 990 (6th Cir. 2020) (quoting *Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 427 (6th Cir. 2014)); *see*

---

[16] The emails *do* reveal, however, that the head of the investigation *did* correspond with Shogren, the hearing officer, and John Nilon, of CSX's Labor Relations Department. (Doc. No. 61-15 at 2, 4.) Logan relied, in part, on Shogren's recommendations, as well as reviewing the hearing transcript and listening to the recommendations of Hatcher and CSX's Labor Relations Department. (Doc. No. 62 ¶ 40.). The plaintiff also draws this court's attention to Logan's deposition testimony, where he states that he would "skim the whole [hearing] transcript." (Doc. No. 72 ¶ 17 (citing Doc. No. 61-16 at 3, Logan Dep. 16:12–21).)

24

*also Arendale v. City of Memphis,* 519 F.3d 587, 604 n.13 (6th Cir. 2008) ("When an adverse . . . decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability."). Cat's paw liability does not replace the *prima facie* test, though. *Marshall v. Rawlings Co. LLC*, 854 F.3d 368, 379–80 (6th Cir. 2017) (a plaintiff asserting cat's paw liability "must satisfy the requirements of the *McDonnell Douglas* framework *and* prove that the decisionmaker was the cat's paw of a biased subordinate") (emphasis added).

Cat's paw liability "allows courts to impute a non-decisionmaker's knowledge and retaliatory intent to a decisionmaker 'where the unbiased decisionmaker relies on information provided by the employee with animus to take an action adverse to the plaintiff.'" *Connally v. U.S. Dep't of Veterans Affs.*, No. 22-10236, 2024 WL 1335183, at *15 (E.D. Mich. Mar. 28, 2024) (quoting *Ellis v. Prospect Airport Servs.*, No. 17-13852, 2019 WL 1417163, at *7 (E.D. Mich. Mar. 29, 2019)). "If disputed issues of material fact exist as to the level of influence of the biased supervisor on the one hand or the level of independence of the decisionmaker on the other, the employer cannot be entitled to summary judgment." *Id.* at *16.

Even assuming that the plaintiff has identified genuine disputed facts about whether Storm had possessed retaliatory intent toward him and whether Storm set in motion the proceeding that led to his termination, the plaintiff has not identified genuine disputed facts, which, when viewed in the light most favorable to him and drawing all reasonable inferences in his favor, would allow a reasonable jury to conclude that Logan was Storm's "cat's paw."

"The most probative factor of the cat's paw analysis when determining whether an employee is one whose animus may be imputed to an employer is the 'employee's ability to

25

influence the ultimate decisionmaker.'" *Voltz v. Erie Cnty.*, 617 F. App'x 417, 424 (6th Cir. 2015) (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 353 (6th Cir. 2012)). There is no evidence in the record that Storm communicated with Logan, testified during the internal hearing, or provided information to Logan. And there is no evidence otherwise that Logan relied on information Storm provided. *Accord Robinson v. Compass Grp. USA*, No. 20-13365, 2022 WL 3359163, at *7 (E.D. Mich. Aug. 15, 2022), ("Most importantly, [the decision-maker] reached his termination decision by relying on statements from employees other than [the allegedly retaliatory supervisor].") *aff'd sub nom. Robinson v. Compass Grp. USA, Inc.*, No. 22-1819, 2023 WL 8613501 (6th Cir. Aug. 16, 2023).

Thus, the court finds that the plaintiff has not identified disputed material facts sufficient for a reasonable jury to find that the decision-maker had knowledge of his protected activity or, under a cat's paw theory of liability, that Storm's retaliatory animus, if any, could be imputed to the decision-maker. The court will grant the defendant's Motion as to Counts II and IV, and they will be dismissed.

B.    Americans with Disabilities Act claims

The plaintiff also alleges violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* Count V ("Inquiry") alleges that CSX ordered Forrest to submit to medical exams and produce records "without cause to believe he suffered from any condition that prevented him from safely doing his job, in violation of the ADA." (Doc. No. 46 ¶ 47.) This has caused him emotional distress and loss of income. (*Id.* ¶ 48.) Count VI ("Discrimination") alleges that CSX "put the onus on" him to arrange and pay for medical examinations and to obtain and produce records. (*Id.* ¶ 50.) But even after he "jumped through every hoop [CSX] had erected as soon as practical," CSX "terminated him for supposedly failing to timely obtain and produce" records.

26

(*Id.*) On both counts, Forrest alleges in addition that CSX "violated Forrest's ADA rights with reckless or deliberate disregard," and therefore that he is entitled to punitive damages. (*Id.* ¶¶ 49, 52.)

The defendant argues that the plaintiff does not have a disability, nor did it regard him as having a disability; that return-to-work medical exams are routine and required by the collective bargaining agreement, which the plaintiff conceded in deposition testimony; that the plaintiff disavowed ever bringing an ADA claim; and that he was not required to pay for his examinations.

1. *Count V – Inquiry*

In his brief, the plaintiff specifies that he brings an improper medical inquiry claim pursuant to 42 U.S.C. § 12112(d). (Doc. No. 61 at 20–21.) Forrest argues that CSX violated the ADA's prohibition on employers requiring a medical examination "unless such examination or inquiry is shown to be job-related and consistent with business necessity." (Doc. No. 61 at 20 (quoting 42 U.S.C. § 12112(d)(4)(a)).)

In its opening brief, the defendant appears to concede that 42 U.S.C. § 12112(d)(4)(a), which pertains to current employees, is the governing provision. (*See* Doc. No. 59 at 22 (stating that employers "may require a physical examination of an employee as a pre-condition for returning to work where the examination is job-related and consistent with business necessity" (citing *Pena v. City of Flushing*, 651 F. App'x 415, 420-21 (6th Cir. 2016); *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 812 (6th Cir. 1999)).)

In its reply, however, the defendant argues that subsection (d)(3), which governs post-offer, pre-employment exams, is the relevant provision. This provision states that an employer may require a medical examination "*after* an offer of employment has been made to a job applicant and prior to the commencement of the employment duties. . . ." 42 U.S.C. § 12112(d)(3.)

27

The record is underdeveloped as to which subsection should apply to the Plaintiff. On the one hand, Forrest was terminated on August 27, 2020 and never resumed his duties. On the other hand, on January 5, 2022, the Public Law Board found that Forrest "should be returned to service with seniority unimpaired." (Doc. No. 59-1 at 46.) By a letter dated that same day, CSX ordered Forrest to undergo a return-to-work physical; CSX wrote: "you have been reinstated to service as a result of the attached Board award." (Doc. No. 66-1.) Moreover, in internal emails discussing Forrest, after CSX sent the letter ordering him to undergo a physical but before he was separated from CSX on February 2, 2023, CSX officials alternatively referred to him as "not an employee of CSX" (Doc. No. 61-32 at 2), and as an "employee . . . recently returned to work at Arbitration." (Doc. No. 61-28 at 2.)

The defendant argues that it "made Plaintiff (as it does all new hires in safety sensitive positions as well as all employees who are absent for seven or more consecutive workdays) undergo an examination (including a drug test) before working, making this situation more like an employment entrance examination described in 42 U.S.C. § 12112(d)(3)." (Doc. No. 66 at 4–5.) But subsection (d)(3) would not apply to an employee returning from a seven-day leave. Such an employee would have already accepted a job offer and commenced employment duties. The defendant's argument that Forrest is similarly situated, therefore, undermines its argument that subsection (d)(3) applies. For purposes of summary judgment, therefore, the court will apply subsection (d)(4). Because subsection (d)(4) is the "least restrictive category," this result should only help the defendant's case. *McBratnie v. McDonough*, No. 20-cv-12952, 2023 WL 3318029, at *3 (E.D. Mich. May 9, 2023), *aff'd*, No. 23-1438, 2024 WL 1903803 (6th Cir. Jan. 26, 2024), *cert. denied*, 144 S. Ct. 2619, 219 L. Ed. 2d 1261 (2024), *reh'g denied*, 144 S. Ct. 2723, 219 L. Ed. 2d 1347 (2024).

Under the ADA, employers are prohibited from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In a typical "claim for disability discrimination, the plaintiff must show that . . . she is disabled." *Booth v. Nissan N. Am., Inc.*, 927 F.3d 387, 393 (6th Cir. 2019) (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)). "However, when plaintiffs 'bring a claim under § 12112(d), they are not required to allege that they suffer from a disability as defined by the ADA or that they were discriminated against because of a disability.'" *McBratnie v. McDonough*, No. 2:20-cv-12952, 2023 WL 3931489, at *3 (E.D. Mich. Apr. 24, 2023) (quoting *Garlitz v. Alpena Reg'l Med. Ctr.*, 834 F. Supp. 2d 668, 677 (E.D. Mich. 2011)), *R. & R. adopted*, No. 20-cv-12952, 2023 WL 3318029.

As discussed above, the ADA prohibits both "medical examination[s]" and "inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

The plaintiff captions Count V as "Inquiry" and alleges that "CSX ordered Forrest to submit to a medical examination *and* produce his medical information and/or records . . . ." (Doc. No. 46 at 6 & ¶ 47 (emphasis added).) And in the plaintiff's Response, he argues that the initial return-to-work examination, follow-up examinations, *and* required documentation were unwarranted. (Doc. No. 61 at 21.) The plaintiff writes, "CSX's bare assertion that its inquiries were reasonable or safety-related does not satisfy the business-necessity exception." (*Id.* (internal quotation marks and citation omitted).) The plaintiff argues in the alternative that, even if the return-to-work examination were permissible under the ADA, CSX "has offered nothing to prove

29

that its demands that Forrest" provide additional information about his anxiety and sleep apnea were justified by business necessity. (*Id.*)

In its Reply brief, the defendant states, "the Response establishes that Count V . . . is limited to the allegation that CSX[] violated the ADA by requiring Plaintiff to undergo a return-to-work physical examination, which is time-barred and compliant with the ADA." (Doc. No. 66 at 4 (footnote omitted).) The court disagrees with this interpretation of the Corrected Amended Complaint and the Response Brief for the foregoing reasons. Importantly, the defendant does not address the plaintiff's improper *inquiry* argument.

The defendant has made no argument that its post-examination inquiries fall under the exception in subsection (d)(4)(A)—permitting inquiries that are job-related and consistent with business necessity. Nor has the defendant argued that asking for records about the plaintiff's anxiety falls under the ADA's very next provision—under the caption "Acceptable examinations and inquiries"—stating that employers may ask about the "ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B); *see also* 29 C.F.R. § 1630.14(c).

Nevertheless, to the extent possible, the court will apply the arguments the defendant makes that it should prevail on the plaintiff's improper medical *exam* claim to the plaintiff's improper medical *inquiry* claim.

First, the defendant argues, for the first time in its Reply brief, that the plaintiff's allegation that CSX violated the ADA by requiring a return-to-work examination is time-barred. (Doc. No. 66 at 4.) Generally, "a discrimination charge must be filed within 300 days after the alleged unlawful employment practice occurred." *Reed v. ADM/ARTCO*, 57 F. App'x 682, 683 (6th Cir. 2003) (citing 42 U.S.C. § 2000e-5(e)). The defendant argues that it ordered the defendant to undergo the allegedly violative examination on January 5, 2022, but the plaintiff did not file his

second charge with the EEOC until February 26 2023—outside the 300-day limit to file a charge. (*Id.* (citing 42 U.S.C. § 2000e-5(e)(1)).)

Even if CSX's post-exam medical inquiries were also time-barred, "the Supreme Court has held that the 300-day limitation for filing a charge with the EEOC is subject to waiver[.]" *Id.* (citing *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393 (1982)). The "timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court[.]" *Zipes*, 455 U.S. at 393. And arguments raised for the first time in reply briefs are typically waived. *See, e.g.*, *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) (holding arguments raised for first time in reply brief are waived); *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (same); *see also Hamilton v. Astrue,* No. 1:09-cv-260, 2010 WL 1032646, at *6 (N.D. Ohio Mar.17, 2010) ("A reply brief is a plaintiff's opportunity to respond to arguments raised for the first time in the defendant's brief. A plaintiff cannot wait until the reply brief to make new arguments, thus effectively depriving the opposing party of the opportunity to expose the weaknesses of plaintiff's arguments.") Thus, the court finds that the defendant has waived the argument that the plaintiff's second charge with the EEOC was time-barred.

Second, the defendant argues that "Count V fails because Plaintiff is not disabled." (Doc. No. 59 at 22.) But "[a] plaintiff need not prove that he or she has a disability in order to contest an allegedly improper medical inquiry under 42 U.S.C. § 12112(d)." *McBratnie*, 2024 WL 1903803, at *2.

Third, the defendant argues that the plaintiff conceded, in deposition testimony, that such examinations are routine and required by his collective bargaining agreement. (Doc. No. 59 at 21–22; Doc. No. 66 at 4–5.) As discussed above, the court finds that it is contested whether such examinations are required by the plaintiff's collective bargaining agreement. The defendant has

31

not put forth any evidence—other than the deposition testimony of the plaintiff and a former co-worker—about what kinds of medical evaluations the collective bargaining agreement requires.[17] Moreover, "while the agreement may help to explain [CSX]'s actions, such an agreement does not immunize [CSX] from liability under the ADA." *Harmon v. Clark Cnty.*, No. 2:08-cv-00151-LRH-LRL, 2009 WL 3785528, at *4 (D. Nev. Nov. 12, 2009).

Fourth the defendant maintains that the plaintiff's duties—moving, fueling, sanding, and cleaning locomotives—are "safety sensitive." (Doc. No. 59 at 22; Doc. No. 66 at 4). CSX's argument is persuasive to a point. Indeed, not only does the ADA permit medical examinations and inquiries that are "job-related and consistent with business necessity," 42 U.S.C. § 12112(d)(4)(A), but employers may ask about the "ability of an employee to perform job-related functions." *Id.* § 12112(d)(4)(B). But the defendant has not argued or shown that requiring Forrest to present documentation about a one-time anxiety attack related to sleep apnea is job-related and consistent with business necessity or related to his ability to perform his job-related functions. The defendant has not presented any evidence about what its medical review entails, under what standards its medical review team operates, or how it complies with the ADA's standards for inquiries.

Without any argument on this point, the court cannot grant the defendant's Motion for Summary Judgment as to Count V.

2. *Count VI – Discrimination*

In Count VI, the plaintiff alleges discrimination under the ADA. (Doc. No. 46 ¶¶ 50–52.) Forrest alleges that CSX (1) "put the onus on Forrest to arrange and pay for the examinations and . . . to obtain and produce records"; and (2) "terminated him for supposedly failing to timely obtain

---

[17] The Collective Bargaining Agreement is not in the record.

and produce [the records]." (*Id.* ¶ 50.) In its opening brief, CSX argues that Count VI fails because Forrest cannot make out "any of the necessary elements" of a *prima facie* case of disability discrimination. (Doc. No. 59 at 23.) In his Response, Forrest clarifies that "CSX refused to return Forrest to work because of his medical condition," that this constitutes "direct evidence of discrimination," and that therefore he "need only show that he has a disability and 'is otherwise qualified for the job despite the disability.'" (Doc. No. 61 at 22 (quoting *Baum v. Metro Restoration Servs, Inc.*, 764 F. App'x 543, 545 (6th Cir. 2019)).) Forrest argues that, "[b]ecause CSX admittedly prohibited Forrest from working because of his medical conditions, it is therefore undisputed that CSX regarded Forrest as disabled." (Doc. No. 61 at 23.)

Title I of the ADA prohibits employers from discriminating against an employee "on the basis of disability." 42 U.S.C. § 12112(a); 29 C.F.R. § 1630.4(a)(1). The definition of "disability" in the ADA, as amended in 2008, includes three independent prongs: (A) "a physical or mental impairment that substantially limits one or more major life activities of such individual," (B) a record of being disabled, or (C) being "regarded as" disabled. *Equal Emp. Opportunity Comm'n v. W. Meade Place, LLP*, 841 F. App'x 962, 966 (6th Cir. 2021) (quoting 42 U.S.C. § 12102(1) and citing 29 C.F.R. § 1630.2(g)(2); *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 318 (6th Cir. 2019)). "To state the threshold condition of a 'regarded as' ADA claim, an employee need only show that their employer believed they had a 'physical or mental impairment,' as that term is defined in federal regulations. *Babb*, 942 F.3d at 317. A "mental impairment" includes "[a]ny . . . mental illness." 29 C.F.R. § 1630.2(h)(2).

The defendant argues that the plaintiff "has no proof CSX[] ever considered him disabled." (Doc. No. 59 at 23.) In January 2022, Forrest had an exam with Dr. Caleb Wallwork,[18] who found

_____

[18] Who, as the court explained above, appears to be the doctor to whom CSX referred the plaintiff.

33

that Forrest's medical history included sleep apnea and anxiety, which "need[ed] to be addressed before he can be approved to do safety sensitive work." (Doc. No. 21 ¶ 55 (citing Doc. No. 59-5 at 13).) Dr. Wallwork recommended that Forrest see a sleep specialist and a mental health professional. (*Id.*) CSX told Forrest to follow Dr. Wallwork's recommendations. Thus, the court cannot find as a matter of law that no reasonable juror could find that CSX believed that Forrest had a mental impairment or sleep issue that was concerning. *Cf. W. Meade Place, LLP*, 841 F. App'x at 970 ("Under the 'regarded as' prong of the ADA, membership in the protected class becomes a question of intent. And that question — *i.e.*, the employer's motive—is one rarely susceptible to resolution at the summary judgment stage." (quoting *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001))).

Once the plaintiff meets the threshold condition of showing that his employer regarded him as having an impairment, the plaintiff must show that his employer took an adverse employment action because of the actual or perceived impairment. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (*en banc*). Proof of discrimination can be by direct or circumstantial evidence. *Baum*, 764 F. App'x at 545. Forrest maintains that CSX admittedly prohibited Forrest from working because of his medical conditions, which constitutes "direct evidence of discrimination." (Doc. No. 61 at 22–23.) But the defendant makes no such admission, and Forrest points to no other evidence. Without direct evidence, "an employee may point to circumstantial evidence of discrimination under the well-trod *McDonnell Douglas* burden-shifting framework." *Babb*, 942 F.3d at 319.

To make out a *prima facie* case of discrimination, a plaintiff must show that "(1) he or she is disabled, (2) he or she is otherwise qualified for the position, with or without reasonable accommodation, (3) he or she suffered an adverse employment decision, (4) the employer knew

or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891–92 (6th Cir. 2016) (abrogated on other grounds). For a "regarded as" claim, however, elements (1) and (4) are "already captured in the threshold inquiry into whether the employee has adduced evidence showing that their employer believed they had a[n] . . . impairment." *Babb*, 942 F.3d at 320 n.8. In addition, for a "regarded as" plaintiff, inquiries into reasonable accommodations are irrelevant. *Id.* And in this case, the fifth element does not easily fit the facts. Recognizing that "the *prima facie* proof required from [a plaintiff] is not necessarily applicable in every respect to differing factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the court does not apply the fifth element in this case. *Accord, e.g.*, *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1064 (6th Cir. 2022) ("When the plaintiff alleges that defendants canceled the position itself as a pretext to conceal a discriminatory failure to hire, it would be nonsensical to say the plaintiff suffered no adverse employment action unless he could also show that someone else was hired for the nonexistent position."); *Smith v. Siskin Steel & Supply Co., Inc.*, No. 1:20-cv-360, 2022 WL 1665183, at *5 (E.D. Tenn. May 25, 2022) ("[A] court should modify or depart from the usual formulation of the framework when the facts require it." (citing *McDonnell Douglas*, 411 U.S. at 802 n.13)). Thus, elements (2) and (3) remain.

The plaintiff argues that he was qualified for the position. (Doc. No. 61 at 23–24.) Indeed, the plaintiff was originally terminated for walking off the job without permission, not because he was unqualified for the job. The defendant makes no attempt to rebut that the plaintiff was qualified for his job—other than to state that the plaintiff cannot make out *any* element of the *prima facie*

test. (Doc. No. 59 at 23.)[19] Thus, there remains at least a disputed material fact about whether the plaintiff was qualified for the position he had, and, because the court must view the facts in the light most favorable to the plaintiff, this element is viewed as established.

The plaintiff argues that he suffered two adverse employment actions—he was held in limbo for a year and then he was terminated. (Doc. No. 61 at 24.) The defendant does not address this element or respond to this argument. Thus, there remains a disputed material fact about whether the plaintiff suffered an adverse employment action—although it can hardly be disputed that termination is not an adverse employment action. So, the court finds that the plaintiff has made out a *prima facie* case of disability discrimination, which is a "'not onerous' requirement.'" *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

The burden then shifts to the defendant to "offer a legitimate explanation for its action, which is also rarely an onerous requirement." *Babb*, 942 F.3d at 320 (citation and internal quotation omitted). "The defendant merely has to offer admissible evidence adequate to support a finding that the defendant-movant had such a reason and does not have to show no reasonable jury could fail to find that the defendant-movant had such a reason." *Sloan-Brown v. Meharry Med. Coll.*, No. 3:20-cv-01108, 2024 WL 1293860, at *11 (M.D. Tenn. Mar. 26, 2024) (Richardson, J.). But the defendant does not meet its slight burden. Neither in its Memorandum nor in its Reply, in the sections addressing Counts V and VI, does the defendant proffer a legitimate explanation for requiring multiple rounds of examinations and medical documents from the plaintiff or explain its

---

[19] Moreover, the defendant has conceded, for purposes of summary judgment, that the plaintiff *was* qualified. (Doc. No. 59 at 14 n.15.)

36

decision to separate Forrest from CSX on February 2, 2023. For this reason, the court cannot grant the defendant's Motion for Summary Judgment as to Count VI.[20]

C.    Motion to Strike

The defendant has moved to strike seven declarations the plaintiff filed with his Response. (Doc. No. 64 (moving to strike Doc. Nos. 61-4 through 61-10).) Because the court does not rely on the at-issue declarations in its analysis of the Motion for Summary Judgment, the defendant's Motion to Strike will be denied as moot.

V.    **CONCLUSION**

For the reasons set forth herein, the Motion for Summary Judgment (Doc. No. 58) will be granted in part and denied in part. Specifically, the motion will be granted as to Counts I–IV, and those counts will be dismissed with prejudice. The motion will be denied with respect to Counts V and VI. The Motion to Strike (Doc. No. 64) will be denied as moot.

_____
ALETA A. TRAUGER
United States District Judge

---

[20] The plaintiff has presented a strong case in his favor on the ADA claims. Had he moved for summary judgment on these claims, he might well have prevailed.

37